# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>ONE MOTOROLA CELLPHONE UNDER<br>RULE 41 | )<br>)<br>)<br>)<br>)<br>) |

Case No.  25-SW-383

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed  *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year); | |
| 18 U.S.C. § 933 (Firearm Trafficking). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Angelica Serrata* #6545

_____
*Applicant's  signature*

Angelica Serrata, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date:  12/10/2025

_____
*Judge's signature*

City and state:  Washington, D.C.

Moxila A. Upadhyaya
_____
(United States Magistrate Judge)

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means    ☑ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | |
| *or identify the person by name and address)* ) | Case No.  25-SW-383 |
| ONE MOTOROLA CELLPHONE UNDER ) | |
| RULE 41 ) | |
| ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____December 24, 2025_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Moxila A. Upadhyaya_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____12/10/2025_____

City and state: _____Washington, D.C._____

*Judge's signature*

Moxila A. Upadhyaya
United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: <br><br> 25-SW-383 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**

*Property to be searched*

The property to be searched is a cracked Motorola cellphone, Metropolitan Police Department barcode 11286519 (hereinafter, the "TARGET DEVICE"). The TARGET DEVICE is currently stored by the Metropolitan Police Department, located at 17 DC Village Lane SW, Washington, D.C.

**ATTACHMENT B**

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to the commission of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1) and Firearm Trafficking in violation of 18 U.S.C. § 933  (the "TARGET OFFENSES") as described in the search warrant affidavit, including, but not limited to call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data that contain, constitute evidence of, document, establish, identify, or reflect:

    a.  Establishing or documenting the commission of the TARGET OFFENSES;

    b.  Identifying locations where the individual committed the TARGET OFFENSES, traveled to before and after the commission of the TARGET OFFENSES, and in preparation for the TARGET OFFENSES;

    c.  Reflecting the ownership and use of the TARGET DEVICE by the individual committing the TARGET OFFENSES;

    d.  Documenting meetings and communications between individuals committing one or more of the TARGET OFFENSES;

    e.  Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals, discussing the commission of one or more of the TARGET OFFENSES;

f.  Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals who may have assisted or provided support in the commission of one or more of the TARGET OFFENSES;

g.  Containing photographs or video that would constitute evidence of a violation of the TARGET OFFENSES, to include  Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1), Firearm Trafficking in violation of 18 U.S.C. § 933;

h.  Documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband in violation of the TARGET OFFENSES; and

i.  Any records and information relating to the acquisition or possession of firearms by JOLONTA LITTLE or any associates;

j.  Records and information related to the email addresses, phone numbers, social media, account identifiers used by perpetrators, aiders and abettors, co-conspirators, and accessories after the fact concerning the TARGET OFFENSES;

k.  Evidence of who used, owned, or controlled the TARGET DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

l.  Evidence of software, or the lack thereof, that would allow others to control the TARGET DEVICE, such as viruses, Trojan horses, and other forms of malicious

software, as well as evidence of the presence or absence of security software designed to detect malicious software;

m.  Evidence of the attachment to the TARGET DEVICE of other storage devices or similar containers for electronic evidence;

n.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the TARGET DEVICE;

o.  Evidence of the times the TARGET DEVICE was used;

p.  Passwords, encryption keys, and other access devices that may be necessary to access the TARGET DEVICE;

q.  Documentation and manuals that may be necessary to access the TARGET DEVICE or to conduct a forensic examination of the TARGET DEVICE;

r.  Records of or information about Internet Protocol addresses used by the TARGET DEVICE; and

s.  Records of or information about the TARGET DEVICE's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF ONE MOTOROLA PHONE UNDER RULE 41** | **Case No. 25-sw-383**<br><br>**UNDER SEAL** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION
### UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

**I,** Angelica Serrata of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, a cracked Motorola cellphone, Metropolitan Police Department barcode 11286519 (hereinafter, the "TARGET DEVICE"), as described in Attachment A that is currently in the possession of the Metropolitan Police Department, located at 17 DC Village Lane SW, Washington, D.C. Such a search would include an examination of the seized device for information described in Attachment B.

2.     Unless otherwise noted, wherever in this affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

3.     Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation.

1

## **AFFIANT BACKGROUND**

4.     I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I have been a Special Agent with ATF since January 2021.  I am currently a member of the ATF Washington Field Division's Washington Group III.  My assignments include investigating individuals involved in illegal possession and transfer of firearms, violent crimes involving firearms, and narcotics and firearms trafficking.  I am also a graduate of the ATF Special Agent Basic Training program in Glynco, Georgia.  As a Special Agent with ATF, I am authorized to investigate violations of the laws of the United States, and I have been involved with numerous criminal investigations involving violations of federal law. I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States. *See* 18 U.S.C. § 3051.

5.     During my career in law enforcement, I have participated in investigations of individuals and entities for possible violations of federal laws, particularly those laws found in Title 18 and Title 21 of the United States Code.  I have also participated in the use of cooperating informants, undercover agents, video surveillance, GPS tracking devices, search warrants, and audio surveillance, among other law enforcement techniques.  Moreover, I have participated in numerous controlled buys of firearms and narcotics from targets of law enforcement investigations.  I have also been involved in proactive and reactive cases.  I have received specialized training in the investigation of federal crimes involving the trafficking of firearms. Further, I have participated in firearm trafficking investigations that resulted in arrests of numerous subjects, the seizure of property and assets, and the seizure of firearms.  Through my training and

experience, I have become familiar with the methods and techniques associated with the trafficking of firearms.

6.       Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of commission of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1), and Firearm Trafficking in violation of 18 U.S.C. § 933  (the "TARGET OFFENSES") has occurred. There is also probable cause to search the TARGET DEVICE, further described in Attachment A, for the things described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.       The property to be searched is a cracked Motorola cellphone, Metropolitan Police Department barcode 11286519 (TARGET DEVICE). The TARGET DEVICE is currently stored by the Metropolitan Police Department, located at 17 DC Village Lane SW, Washington, D.C.

## PROBABLE CAUSE

8.       On Thursday, November 20, 2025, at approximately 2105 hours, Metropolitan Police Department ("MPD") Officers responded to a call for service for a person who was asleep behind the wheel while in a drive-through lane at a McDonald's Restaurant located at 4301 Nannie Helen Burroughs Ave NE in, Washington, D.C.

9.       Officer Koksaldi approached the driver's side of the vehicle and observed the driver, JOLONTA LITTLE (DOB: 08/04/1990; PDID 570-852, hereinafter, "LITTLE") unconscious behind the steering wheel. Visible in LITTLE's hands was a cell phone with an illuminated screen (the "TARGET DEVICE").



***LITTLE with the TARGET DEVICE  in His Hands***

10.    Officer Koksaldi saw the driver's foot on the brake and observed the gear shift in drive. Officer Nava  approached the driver's side as well and began tapping on the vehicle window and door to wake LITTLE up. After a brief time, LITTLE woke up and appeared to be disoriented, and the vehicle began moving. LITTLE was ordered numerous times to stop the vehicle. He failed to comply and struck a parked MPD cruiser.



*Officers Trying to Stop the Car As it Moved Forward*



***LITTLE's Vehicle Where it Struck the Cruiser***

11.     After LITTLE struck the cruiser, the vehicle came to a stop, and LITTLE put the car in park. LITTLE was escorted out of the vehicle and detained.  Officers conducted a Standard Field Sobriety Test (SFST) while on scene.  LITTLE displayed multiple signs of impairment. Officers further conducted an Advanced Roadside Impaired Driving Enforcement (ARIDE) test for LITTLE.  The results of the ARIDE test and the SFST led officers to place LITTLE under arrest for DUI.

12.     Search incident to arrest, officers located a firearm in LITTLE's front waistband area. At the time of recovery, the listed firearm appeared to be fully functional and operable, designed to expel a projectile by means of explosion, designed to be fired by a single hand, and has a barrel length of less than 12 inches. A WALES/NCIC check of the firearm revealed that it

was reported stolen out of Montgomery County, MD on 06/02/2023. (ORI: MD0160400) (OCA: W230026795).



***Officer Nava Pulling the Firearm from LITTLE's pants***

13.     The firearm was a Kel-Tec P11 pistol, Serial Number: AA0V14, with a 10-round magazine, with 4 rounds in the magazine, along with 1 in the chamber.



*The Recovered Firearm On Scene*



*Image of the Firearm and Ammunition*



*Image of Magazine*

14.     Your affiant is aware there are no firearm or ammunition manufacturers in the District of Columbia.  Therefore, the ammunition described above necessarily traveled in interstate commerce before they were recovered in the District of Columbia.

15.     Your affiant is also aware that LITTLE is known to acquire and possess illegal firearms.

16.     Your affiant is further aware that LITTLE uses his phone both to facilitate the acquisition of firearms and to document his possession of them.  In connection with the homicide investigation in 2016-CF1-015294, MPD obtained a search warrant for and searched LITTLE's phone, pursuant to D.C. Superior Court Warrant 16 CSW 3644. Upon reviewing the warrant return, your affiant observed multiple images of firearms saved on LITTLE's device. Notably, these

images reflect creation dates of July 4, 2016 – the same date as the homicide – further corroborating

LITTLE's unlawful possession of firearms during the relevant time period.

| 1629 | Name: | 1467607541382.jpg | Size (bytes): | 13208 | |
|---|---|---|---|---|---|
| | Path: | userdata (ExtX)/Root/media/0/DCIM/.thumbnails/1467607541382.jpg | Created: | 7/4/2016 12:45:41 AM(UTC-4) | |
| | | | Modified: | 7/4/2016 12:45:41 AM(UTC-4) | |
| | MD5: | 789e59301670554ca798c07559e154e3 | Accessed: | 7/4/2016 12:45:41 AM(UTC-4) | |
| 1630 | Name: | 1467607555725.jpg | Size (bytes): | 14091 | |
| | Path: | userdata (ExtX)/Root/media/0/DCIM/.thumbnails/1467607555725.jpg | Created: | 7/4/2016 12:45:55 AM(UTC-4) | |
| | | | Modified: | 7/4/2016 12:45:55 AM(UTC-4) | |
| | MD5: | 062d323316fdb3e94fbdff9b827c4e42 | Accessed: | 7/4/2016 12:45:55 AM(UTC-4) | |

*Metadata Regarding Firearm Photos*



*Closer Image of Firearm Photos*

17.     In addition, your affiant review message conversations obtained from LITTLE's

cellular telephone and observed that LITTLE engaged in discussions about obtaining a "dog."

Based on your affiant's training and experience in firearms investigations, the term "dog" is

commonly used as slang to refer to a firearm.



*Message from June 22, 2016*

*Message from July 2, 2016*

18.     In his June 22, 2016 message, LITTLE appears to be engaged in a conversation regarding the procurement of a firearm and the amount of money he can "drop" on one, and stating "I need a 30 for now and whenever I get the money I'll do that."  Based on this, it appears that LITTLE used his cellular device to facilitate discussions about obtaining firearms.  Additionally, in a message from June 2, 2016, LITTLE referenced the use of a firearm when he said, "so I pull out the dog and ppl start running and shit," further demonstrating his willingness to discuss both possession and use of firearms.

19.     In this case, the TARGET DEVICE was located on LITTLE's person at the time of his stop and arrest.  LITTLE appeared to have been actively using the TARGET DEVICE before he fell unconscious as the TARGET DEVICE was in his hands and the screen was illuminated when officers arrived.  There is reason to believe that the TARGET DEVICE contained information regarding LITTLE's firearm and ammunition possession.  Specifically, the firearm and ammunition recovered from LITTLE also could not have originated in the District of Columbia.  Therefore, they would have had to travel in interstate commerce.  Further, because LITTLE was prohibited from carrying a firearm as a result of prior convictions he would not have been able to obtain the firearm and ammunition from an authorized dealer in the District of

Columbia. This combined with the fact that LITTLE has a history of using his cell phone to discuss use of firearms and the possible procurement of firearms makes it reasonable to believe that that is the method he uses to get firearms. It is thus reasonable to believe that he may have used a phone to facilitate his obtaining of the firearm and ammunition. All of this taken together creates probable cause to believe that the TARGET DEVICE will reveal evidence of the TARGET OFFENSES.

### THE TARGET DEVICE

20.    I have experience investigating the statutes underpinning probable cause.

21.    To prove a violation of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year), the Government must prove that:

    a.  The defendant possessed a firearm or ammunition;

    b.  The defendant did so knowingly and voluntarily; and

    c.  At the time the defendant possessed the firearm, they had been convicted of a crime punishable by more than a year imprisonment and were aware of that fact.

22.    The federal Firearms Trafficking statute, 18 U.S.C. § 933, criminalizes a broad array of conduct including shipping, transporting, transfer, causing to be transporting, otherwise disposing, or receiving any firearm if the transporter or receiver is aware that the possession or receipt of the firearm under those circumstances would constitute a felony. That statute also criminalizes any attempt or conspiracy to do the same. The Government must prove that the person

12

doing such transferring or receiving knows or has reasonable cause to believe that the use, carrying, or possession of the subject firearm by the recipient constitute a felony.

*Cellphones are Ubiquitous and Regularly Contain Evidence of the TARGET OFFENSES*

23.     It is well-known that virtually all adults in the United States use mobile digital devices. In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that that same 2019 report estimated that 81% of Americans use at least one smartphone. *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Jan. 9, 2021).

24.     Our courts have repeatedly recognized the ubiquity of cellphones. *See, e.g.*, *Riley v. California*, 134 S. Ct. 2473, 2490 (2014) (noting that as of 2014 "more than 90% of American adults . . . own a cellphone). As the Supreme Court found, cell phones are "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Id; see also Riley*, 573 U.S. at 395 ("According to one poll, nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower.")

25.     This data and findings by our courts is consistent with my experience as a law enforcement officer. In almost all of the firearm investigations I have been involved in, when an individual is arrested, he or she is found to be in actual or constructive possession of at least one cellphone. Indeed if law enforcement does not locate such a device, it is cause for concern, and typically would result in additional effort to ensure that law enforcement has not missed a device in the search.

26.     Further, in my experience, individuals use cellphones for all aspects of life. Cellphones allow the basic communication functions of a telephone. But they also contain

13

applications which allow users to engage in almost every daily task. This includes communication, taking video and pictures of important documents, objects, and moments, navigating oneself, paying for items, making and managing appointments for all manner of activities, banking, reserving local and foreign travel, renting vehicles or reserving shared rides, and dozens of other activities.

27.    Given their pervasiveness, as well as their use in these tasks, a cellphone contains a digital record of an individual's life.

28.    Our courts have found the same. *See*, e.g*., Riley*, 573 U.S. at 395 ("The sum of an individual's private life can be reconstructed" with a cellphone.)

29.    Further, and in my experience, as set forth below cellphones can contain significant evidence of the TARGET OFFENSES.

30.    Over the last three years, the Project Safe Neighborhoods (PSN) program has operated in most federal jurisdictions, with a focus to reduce violent crime. Here in Washington, D.C., that program has, among other things, focused on the arrest and prosecution of repeated firearm or violent offenders for firearms offenses, specifically including violations of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year) and 18 U.S.C. § 933 (Firearm Trafficking). Over 200 federal firearms defendants have been prosecuted through the PSN program in Washington, D.C. over the last several years. In almost all of these cases, where an individual is arrested on scene, they are arrested with a cellphone. Where an individual is subsequently arrested with an arrest warrant based on longer investigations, those individuals almost always have a cellphone on their person or nearby to their person (e.g. in their residence).

31.     Further, in the significant majority of cases where law enforcement is able to access a suspect's device in the context of the investigation of the TARGET OFFENSES, that suspect's device contains evidence relevant to the TARGET OFFENSES.[1] As set forth below, this includes photographs of an individual with the charged or other firearms, communications regarding the acquisition of the charged or other firearms, ammunition, firearms paraphernalia and accessories, searches and other activity reflecting attempts to purchase firearms, ammunition, firearms paraphernalia and accessories, as well as evidence connecting an individual to the location, container, or vehicle in which a firearm is recovered.

*Cellphones Contain Photographic and Video Evidence of Firearm Possession*

32.     I am aware from discussions with other law enforcement agents, as well as my own experience, of many cases in which a suspect is arrested in actual or constructive possession of a firearm(s) and that suspect's cellphone contains images or videos of what appears to be the specific subject firearm(s).  I am aware of numerous cases where the recovered imagery is clear and detailed enough to match make, model and color.  In other instances, the imagery is detailed enough as to accurately identify distinctive markings and scratches.  I am further aware of many instances where law enforcement has obtained imagery which shows partial or entire serial numbers, which allow law enforcement to confirm the identity of the subject firearm(s).  In all of these cases, some of these cases include stand-alone imagery of firearms, but many of these cases include imagery of a suspect or suspects actually holding or otherwise in possession of the firearms.

---

[1] Law enforcement is not always able to obtain full cellphone extractions from cellphones.  This can be caused by a variety of factors such as specific security features, the make and model of the cellphone, the operating system used by the cellphone, the condition in which the phone is recovered, and the speed with which law enforcement is able to obtain a search warrant.

33.     This type of evidence is compelling evidence of the TARGET OFFENSES. That is, an individual's possession of a firearm on other occasions tends to suggest that they possessed a firearm on the charged occasion. Further, it tends to suggest that their possession of a firearm was not accidental or by mistake, but knowing and voluntary.

34.     This is particularly true because, in my experience and based on discussions with other law enforcement agents, law enforcement on many occasions is unable to obtain DNA or fingerprint evidence from firearms given their surfaces, how they are often passed from person to person, and limitations in the number of DNA profiles which can be compared, among other reasons.

35.     In the absence of forensic evidence, images of an individual in possession of the charged firearm, of the charged firearm on its own, and even of other firearms is compelling evidence of the TARGET OFFENSES. As noted, I am aware that this type of evidence is regularly recovered from cellphones in cases such as this one.

*Cellphones Contain Communications Regarding Firearm Possession and Trafficking*

36.     I am aware from discussions with other law enforcement agents, as well as my own experience, of many cases in which a suspect is arrested in actual or constructive possession of a firearm and that suspect's cellphone contains communications regarding firearm possession and trafficking.

37.     Specifically, I am aware that phones of federal firearms defendants charged in the PSN program regularly include texts, chats, and voice messages, in which a suspect communicates their interest in acquiring firearms, communicates regarding specific makes and models of firearms, negotiates for the purchase of firearms, discusses the need for the suspect to acquire firearms, and exchanges photographs or videos of firearms. These communications are sometimes

through the cellphone's native messaging application and sometimes through other communication and social media applications, such as WhatApp and Instagram.

38.     Individuals like LITTLE are prohibited from purchasing firearms. Such individuals cannot legally purchase firearms at gun stores or gun shows. Instead, they must illegally purchase firearms from individuals selling those guns in an unlawful and unlicensed manner. Illegal gun dealers cannot rely on traditional advertising such as Google or Facebook advertisements, billboards, or radio or television advertisements for fear of investigation and arrest. Instead, in my experience, individuals illegally selling guns, advertise on social media platforms such as Instagram, or more often, advertise or conduct sales by directly messaging the buyers via communications or social media applications. Often individuals selling firearms will direct message one or more firearms laying on flat surface such as a table or bed to display what is for sale.

39.     This type of evidence, which is commonly recovered from the cellphones of PSN suspects, is evidence of the TARGET OFFENSES.

*Cellphones Contain Financial Transactions Regarding Firearms*

40.     As noted above, individuals like LITTLE, are legally prohibited from purchasing firearms. And the illegal sellers of firearms do not operate traditional businesses. This means that they typically do not accept credit or debit card payments. While some of these sellers operate cash business, I am aware from my own experience and from discussions with other law enforcement agents, that individuals buying and selling illegal firearms often make and accept payments using cellphone peer-to-peer applications like CashApp, ApplePay, and Venmo.

41.     I am aware that cellphones recovered from federal firearms defendants in some cases contain evidence of payments made to individuals suspected of firearm trafficking in amounts consistent with the amount an individual would pay for an illegal firearm.

*Cellphones Contain Evidence of a Suspect's Prohibited Status*

42.     Individuals often use cellphones to photograph documents or notes that are important to their daily lives.  Individuals who are subjects of the PSN program are, generally speaking, prohibited persons. This means that these individuals have been convicted of felony offenses and could be on some form of court-ordered supervision.

43.     In my experience, and from discussions with other law enforcement agents, cellphone extractions from federal firearms defendants charged in the PSN program regularly contain photographs of documents relevant to a subject's prohibited status.  Specifically, I am aware that such phone extractions contain photographs of a suspect's judgment and conviction paperwork, probation or supervised release paperwork, gun offender registration paperwork, or other paperwork reflecting the fact of, and the subject's awareness of, a disqualifying conviction or other status.

44.     This type of evidence is compelling evidence of the TARGET OFFENSES and is found with regularity on the phones of PSN subjects.

*Cellphones Contain Evidence Connecting a Suspect to the Recovery Location of Firearms*

45.     In my experience investigating federal firearms offenses, many times a firearm is not recovered from a suspect's person, but is recovered from a residence, vehicle, bag, or clothing associated with that suspect.  I have investigated many such constructive firearm possession cases.

46.     In those cases, law enforcement seeks to determine what, if any, connections exist between the location, conveyance, or container where the firearm was recovered (e.g., the

residence, vehicle, or bag), and a suspect.

47.     I am aware that in these constructive possession cases, cellphones of federal firearms defendants charged in the PSN program often contain evidence linking them to the location, conveyance, or container where a firearm was recovered.  For example, I am aware of photographs and communications linking a PSN subject to a vehicle in which firearms were recovered, including registration documents.  I am also aware of photographs linking PSN subjects to residences or bags in which firearms were recovered, and of suspects providing the residence addresses via communications applications which connects them with the place where the firearm is recovered.  This type of evidence is commonly found on cellphones of PSN subjects.

48.     In sum, a search of the TARGET DEVICE would allow law enforcement to prove that LITTLE, in fact, possessed the charged firearm, that his possession of the firearm was knowing and intentional, and that he was a prohibited person and was aware of that fact.  Further, it would allow law enforcement to investigate the receipt and transfer of this illegal firearm, which is itself a federal crime.  Additionally, evidence from the TARGET DEVICE may yield ownership information of the TARGET DEVICE. All of the aforementioned information would further constitute evidence of the commission of the TARGET OFFENSES.

## **TECHNICAL TERMS**

49.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

        a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

i.      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

ii.      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

iii.      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices,

20

mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.    "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.    A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like

programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt,

compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.    "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.    Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.    The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.    "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in

providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.    A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.    A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.    "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are

24

typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.   "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.   "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.      When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file

into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

      ii.      Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

     o.   "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

     p.   "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about

the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

50.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the TARGET DEVICE, in whatever form they are found. One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on

my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the TARGET DEVICE for at least the following reasons:

      a.    Individuals who engage in criminal activity, including unlawful possession of a firearm or ammunition or firearm trafficking often use digital devices, like the TARGET DEVICE, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the TARGET DEVICE, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation. As set forth above, because LITTLE was not legally able to obtain a firearm from a licensed dealer, it is probable that he used a digital device to facilitate his possession of the firearm and ammunition.

      b.    Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital

devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

      c.    Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

51.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the TARGET DEVICE was used, the purpose of its use, who used it (or did not), and when. Based on my knowledge, training, and experience, as well as information relayed to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in the TARGET DEVICE at issue here because:

      a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the TARGET DEVICE are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the TARGET DEVICE, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card,

or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.    Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.    A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to

31

be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.    Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

52.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

      a.    Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain

specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.     Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a

user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate

unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to

be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

53.     The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

     a.     Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

          i.     Law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, transport the TARGET DEVICE to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the premises. The TARGET DEVICE, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

          ii.     The analysis of the contents of the TARGET DEVICE may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents;

36

"scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

       iii.       In searching the TARGET DEVICE, the forensic examiners may examine as much of the contents of the TARGET DEVICE as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the TARGET DEVICE will be specifically chosen to identify the specific items to be seized under this warrant.

## **CONCLUSION**

54.    Based upon the above-referenced facts, your affiant asserts that there is probable cause to believe that the TARGET DEVICE contains evidence of the TARGET OFFENSES.

55.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

56.    I further request that the Court permit the search warrant to be executed at any time given that the TARGET DEVICE is contained on the premises of the Metropolitan Police Department.

Respectfully submitted,

Angelica Serrata #6545

Angelica Serrata
Special Agent
ATF - Washington

Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 10th day of December, 2025.

The Honorable Moxila A. Upadhyaya
United States Magistrate Judge

38